```
                                                                  1

              UNITED STATES DISTRICT COURT

                 DISTRICT OF CONNECTICUT


MERRY CHARTERS, LLC AND           :  NO:   3:02CV336 (MRK)
CARL SHILLO

V.                                :

TOWN OF STONINGTON, STONINGTON    :  January 28, 2004
PLANNING & ZONING COMMISSION,
ZONING BOARD OF APPEALS OF THE    :  VOLUME II
TOWN OF STONINGTON, EDWARD T.
SULLIVAN AND GEORGE THAYER


DEPOSITION OF:   STEVEN J. SHAPIRO, Ph.D.

APPEARANCES:

SILVESTER AND DALY
        Attorneys for the Plaintiff
        72 Russ Street
        Hartford, CT   06106
        (860) 278-2650
BY:  JOSEPHINE A. SPINELLA, ESQ.


HOWD & LUDORF
        Attorneys for the Defendant
        65 Wethersfield Avenue
        Hartford, CT   06105
        (860) 249-1361
BY:  MELINDA A. POWELL, ESQ.




                    Hilary O. Winslow
              Licensed Court Reporter, #00361
```

NIZIANKIEWICZ & MILLER REPORTING SERVICES
972 Tolland Street
East Hartford, CT   06108
(860) 291-9191

62

1  that was -- he was looking for something that he could
2  operate under his own terms while still being able to care
3  for his child, as I understood it.  And also he ended up in
4  the Mystic area and liked being there and sort of developed
5  the idea for getting going on establishing a business and
6  how he got the captain's license and moved forward to
7  acquiring the boat that he used to operate the business.
8        And the rest of this, he tried to tell me about
9  the relationships that he had established with Mystic
10 Seaport and with Mohegan Sun in terms of joint promotion and
11 the like.  And I think that was the bulk of the meeting.
12      Q.   Okay.  What information gained from that
13 September 23rd meeting did you find relevant for your
14 analysis?
15      A.   I think the ledgers were relevant to the
16 analysis, just background information in terms of his date
17 of birth and how old he was was relevant because I was
18 trying to do the analysis from the context of figuring out
19 his work life expectancy, which is factored into this in
20 terms of explicitly -- in my second report, I explicitly
21 calculated his profits over his remaining work life, also
22 discussions on just the chronology of things, discussions of
23 this promotional tie-in with Mystic Seaport and Mohegan Sun,
24 which I think was a key part of the operation of his
25 business.

1  Q. What is your understanding about the arrangements
2  between Mohegan Sun and Merry Charters?
3  A. It's my understanding -- I don't know if there
4  was any formal contract or anything, but Mohegan Sun --
5  Mohegan Sun was developing promotional materials and did not
6  charge Merry Charters anything for that, for packages that
7  included visits to Mohegan Sun, visits to Mystic Seaport and
8  also tied into the tours of the Mystic Harbor on Carl
9  Shillo's boat. It's my understanding that a lot of that
10 promotional material was distributed to bus tour operators
11 as well as to travel agents. And it was also my
12 understanding from Mr. Shillo that it was his understanding
13 from talks that he had had with an official at Mohegan Sun,
14 who was running the bus charter operation there, to bring
15 bus charters to Mohegan Sun for this advertising. The first
16 year they spent $12,000 on advertising expenditures and
17 $15,000 the following year.
18 Q. That part about the advertising expenditures was
19 at your second meeting?
20 A. Yes.
21 Q. Did you talk about advertising expenditures at
22 your first meeting?
23 A. No.
24 Q. Okay. Was it your understanding that the Merry
25 Charters had a contract with Mohegan Sun?

1  A. I don't know if Merry Charters had a contract or
2  not, but it was my understanding there was some kind of
3  arrangement where this promotion was going on. If there was
4  a written contract or not, I have no idea.
5  Q. Okay. Have you ever seen a written contract?
6  A. No.
7  Q. Have you ever spoken with anyone at Mohegan Sun
8  about any arrangement they had with Merry Charters?
9  A. No.
10 Q. Was there any agreement that you understood as to
11 how much money Mohegan Sun would be paying Merry Charters?
12 A. Well, I think the only agreement was that Merry
13 Charters had a customary charge per head for people who went
14 on their boat and that, as I understand it, they were going
15 to get $7, $8, $9 a head, in that range per person for
16 people boarding. And that's all I knew about it.
17 Q. Was it your understanding that Merry Charters
18 would be getting the $7 or $8 a head from the people, or
19 would they be billing Mohegan Sun?
20 A. I believe -- I'm not sure if they got it from
21 Mohegan Sun or Mystic Seaport. It was my impression that it
22 was not -- that the revenues he got where he collected
23 directly from people were walk-up traffic.
24 Q. Okay. So it was your understanding that he was
25 receiving seven to eight -- was it seven or eight?

    A.    In the range of -- as he explained to me, in the range of $7, $8, $9 per head for --

    Q.    Wouldn't it be a set price?

    A.    Well, this is what he told me.

    Q.    If they had an arrangement, you know, with Mohegan Sun and Mystic Seaport --

    A.    No, I understand that. I mean, this was how it was explained to me.

    Q.    Okay. So Mr. Shillo didn't tell you whether it was $7, $8, or $9 per head?

    A.    No, he just said it was in that range, and I don't have a price schedule, for example.

    Q.    He didn't provide you with a price schedule?

    A.    Not that I know of, not for that. Let me just double check something. Basically, how I understand it from reading the brochures -- I've incorrectly characterized this in terms of -- if he got the revenue, the revenue was paid directly to him by those reserving spots for tour groups directly when they got the Mohegan Sun promotional materials because it's laid out there that one should call Merry Charters to set up the reservation and that also they coordinate things -- they being Mohegan Sun -- so that one gets a certain amount of time in the casino before one would head out to Mystic to go on the boat. Also, in terms of pricing -- and he had a couple of different pricing

1  mechanisms mentioned in there.
2          For individuals who would walk up, he was
3  charging 10 bucks for an adult and $8 for children and
4  seniors for a tour on the boat.  But when he would book a
5  group, it would depend on how long the group was going to be
6  there, whether any kind of food or anything like that was
7  being provided.  It could be anywhere from 150 to 450 for a
8  group.
9       Q.   A group from where?
10      A.   A group from Mohegan Sun that would reserve
11 through Mohegan Sun.  And such a group in principle was
12 supposed to be, as I understand it from my notes and from
13 talking to Carl, was supposed to be roughly 50 people.  But
14 it's hard to pinpoint the exact price beyond that because in
15 the promotional material, it mentions that if certain tour
16 groups and bus companies did repeat business, he did give
17 them discounts.  But those aren't specified, and I think
18 that I was on a group-by-group arrangement.
19      Q.   Were you provided any sales receipts to do your
20 analysis?
21      A.   The only sales receipts -- I had a couple, but, I
22 mean, that's about it.  I mean, I have a complete set.  The
23 only other sales information I would have had would have
24 been whatever is recorded on the ledgers as well as what's
25 on the tax returns.

1    Q.   Well, from what I recall in the ledgers, there
2  were deposits say of a thousand dollars or a couple of
3  thousand dollars.  I didn't see anything itemized.  Do you
4  recall anything that was itemized --
5    A.   No.
6    Q.   -- like on this date, we had this many passengers
7  and made this much money?
8    A.   No.  The only thing that would be itemized, but
9  you couldn't tie it directly to those deposits would be some
10 of the diaries that refer to groups that reserved and in
11 some cases how many people were involved.  But it doesn't
12 have the information where you could do a match to what's in
13 the ledgers.
14   Q.   So we can't tell from the information that the
15 plaintiff provided you how much money he earned from his
16 arrangement with Mohegan Sun?
17   A.   What I can tell you is what he asserted to me,
18 which was that he was earning roughly 40 percent of his
19 revenues from Mohegan Sun and 60 percent of the walk-up
20 traffic during that first season he operated in Mystic
21 Seaport.  But that's all I have.
22   Q.   He didn't provide you any documentation to verify
23 whether that 60/40 split is indeed correct; is that right?
24   A.   That's correct.
25   Q.   And what was your understanding as to how the

1  they basically provide information that's hooked to
2  shoppers, that's hooked up to the internet.
3      Q.   Okay.
4      A.   A business that made -- a business that made very
5  specialized pumps that are inserted into perfume bottles.
6  They would do that, and they would sell these pumps and the
7  pump assembly is the best way I can explain it -- to
8  companies that bottle perfume or sell perfume -- I should
9  say actually bottle perfume.  And, actually, as part of
10 this -- their business was kind of strange because I think
11 -- as I understood it from talking to them -- because of the
12 high value per ounce for a lot of perfume, rather than
13 shipping the bottles out and deal with breakage issues and
14 things like that, there was some arrangement where they were
15 literally -- in addition to supplying the pump parts, they
16 would work with the perfume companies and literally bottle
17 the perfume on the premises also.
18      Q.   Okay.  Was there any documentation provided to
19 you, other than Mr. Shillo's representation, that helps you
20 confirm whether his revenue was, in fact, 60 percent due to
21 walk-up traffic?
22      A.   I have no documentation other than his
23 representation.
24      Q.   Okay.  You issued a report in September of 2003.
25 What was the -- what was the plan regarding your report that

# CERTIFICATE

I, Hilary O. Winslow, License #00361, a Notary Public for the State of Connecticut and Commonwealth of Massachusetts, do hereby certify that the deposition of STEVEN J. SHAPIRO, Ph.D., was taken before me pursuant to the Connecticut Practice Book at Howd & Ludorf, 65 Wethersfield Avenue, Hartford, CT 06105, (860) 249-1361, commencing at 1:08 p.m. on Wednesday, January 28, 2004.

I further certify that the witness was first sworn by me to tell the truth, the whole truth, and nothing but the truth, and was examined by counsel, and his testimony was stenographically reported by me and subsequently transcribed as herein before appears.

I further certify that I am not related to the parties hereto or their counsel, and that I am not in any way interested in the events of said cause.

Witness my hand this 16th day of February, 2004.

*Hilary O. Winslow*
HILARY O. WINSLOW, Notary Public

My Commission Expires:
February 28, 2005 (In MA)

My Commission Expires:
February 28, 2006 (In CT)

NIZIANKIEWICZ & MILLER REPORTING SERVICES
972 Tolland Street
East Hartford, CT 06108
(860) 291-9191