**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| MERRY CHARTERS, LLC and CARL SHILLO | : | |
| Plaintiff | : | CIVIL ACTION NO. |
| | : | 3:02CV336(MRK) |
| v. | : | |
| | : | |
| TOWN OF STONINGTON, STONINGTON | : | |
| PLANNING & ZONING COMMISSION, | : | |
| ZONING BOARD OF APPEALS OF THE | : | |
| TOWN OF STONINGTON, EDWARD T. | : | |
| SULLIVAN and GEORGE THAYER | : | |
| Defendants | : | MAY 5, 2004 |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

**I.    INTRODUCTION**

The Defendants, Town of Stonington [hereinafter "Town"], Stonington Planning

and Zoning Commission [hereinafter "Commission"], Zoning Board of Appeals of the

Town of Stonington [hereinafter "ZBA"], Edward T. Sullivan and George Thayer, filed a

Motion for Summary Judgment dated April 1, 2004.  In the Motion for Summary

Judgment, the Defendants argue that they are entitled to judgment in their favor on the

Plaintiffs' claims for an injunction because such claims have become moot.  The

Defendants also argue that the Plaintiffs cannot prevail on their claims for violations of

their equal protection rights because the Plaintiffs were not treated differently than any

similarly situated businesses and the Defendants did not act with malice when they acted upon the Plaintiffs' zoning applications.  Similarly, the Defendants assert that they are entitled to judgment in their favor on the Plaintiffs' due process claims because the Plaintiffs do not have a protectible constitutional interest in the zoning permits and variances.  Additionally, the Defendants claim that they are protected by absolute and qualified immunity from the Plaintiffs' 42 U.S.C. § 1983 claims.

With regard to the state law claims, the Defendants assert that the claim of negligent infliction of emotional distress is barred by the statute of limitations.  Alternatively, the Defendants argue that they are entitled to judgment in their favor because they are protected by governmental immunity as codified in General Statutes § 52-557n.

The Plaintiffs submit that the Defendants are not entitled to summary judgment on the Plaintiffs' equal protection or due process claims.  The Plaintiffs submit that there are genuine issues of material fact demonstrating that the Defendants treated them differently than other similarly situated businesses and that said different treatment was done arbitrarily and with malice and bad faith.  The Plaintiffs further submit that the Defendants are not entitled to judgment in their favor on the due process claim because the Plaintiffs had a constitutional interest in the permits and variances and the

Defendants acted arbitrarily when they denied the zoning applications.  Moreover, the Plaintiffs argue that the Defendants are not entitled to absolute or qualified immunity on these claims because the Defendants were engaged in prescribed acts that were not quasi-judicial or judicial in nature.

Furthermore, the Plaintiffs assert that the claim of negligent infliction of emotional distress is timely.  Also, the Defendants are not entitled to governmental immunity because there are genuine issues of material fact demonstrating that they were engaged in ministerial acts and acted with malice and bad faith when they determined the Plaintiffs' applications.

For these reasons which are more fully laid out in the Memorandum, the Plaintiffs submit that the court should deny the Defendants' Motion for Summary Judgment.

II.    **FACTS**

A.    **Background**

The Plaintiffs, Carl Shillo and Merry Charters, LLC [hereinafter "Merry Charters"], filed an Amended Complaint, dated July 25, 2003 and a Second Amended Complaint, dated September 17, 2003, against the Defendants.  The Plaintiffs allege claims arising under the equal protection clause and the substantive due process clause.  The

Plaintiffs' also allege state law claims for negligent infliction of emotional distress.  The

Plaintiffs' claims arise out of the following facts.

At all times relevant hereto, the Plaintiff was a resident of Andover, Connecticut.

See Plaintiffs' Exhibit 1, Affidavit of Shillo.  At age forty-nine (49), Shillo enrolled himself

in a program at Mystic Safe Boating to acquire a United States Coast Guard Master

Captain's license.  See Plaintiffs' Exhibit 1, Affidavit of Shillo.  In 2000, at age fifty-one

(51), Shillo began operating a business called Merry Charters, LLC, which was focused

on providing tours on the Mystic River in Stonington, Connecticut.  See Plaintiffs' Exhibit

1, Affidavit of Shillo.  In preparation to run the business, Shillo purchased a boat, named

the "Mystic Belle," which was certified by the United States Coast Guard.  See Plaintiffs'

Exhibit 1, Affidavit of Shillo.  The boat was equipped for a maximum capacity of 57

people.  Plaintiffs' Exhibit 2, Public Hearing Transcript, pg. 20.  Shillo began the

business with the intention to operate it until he retired and to run it as a family

business.  See Plaintiffs' Exhibit 3, Deposition of Shillo, pg. 59-60.  Thus, he intended to

pass the business on to his son once he retired.  See Plaintiffs' Exhibit 3, Deposition of

Shillo, pg. 59-60.

Upon purchasing the boat, Shillo kept the boat at a dock owned by Gerval, Inc.

See Defendants' Exhibit C, Deposition of Larkin, pg. 102-105.  The dock was

designated as part of a condominium complex that Gerval, Inc. owned and was located at 1 Holmes Street.  See Defendants' Exhibit D, Condominium Site Plan; Defendants' Exhibit E, Condominium Declaration.  The dock was designated as "Unit 17" of the condominium complex.  See Defendants' Exhibit D; Defendants' Exhibit E.  The dock had historically been used for commercial boats and businesses.  See Plaintiffs' Exhibit 4, Deposition of Larkin, pgs. 232-233; See Plaintiffs' Exhibit 5, Public Hearing Transcript, pg. 22-23, 27-28.

Part of Merry Charters' business was derived from customers at both Mohegan Sun Casino and Mystic Seaport.  See Plaintiffs' Exhibit 3, Deposition of Shillo, pgs. 44-48.  In essence, customers at Mohegan Sun Casino and Mystic Seaport would purchase discount tickets for a ride on the Mystic Belle.  See id.  The customers were oftentimes transported by bus from the casino and seaport to the Mystic Belle.  Id.

**B.    Interactions With Commission And ZBA**

At all times relevant hereto, Joseph Larkin was the Zoning Enforcement Officer for the Town; Thayer was the Chairman of the Commission; and Sullivan was the Chairman of the ZBA.  See Defendants' Exhibit VV, Affidavit of Thayer; Defendants' Exhibit XX, Affidavit of Sullivan; Deposition of Larkin, pg. 9.  In 2000, Edward Donnelly

was the Town Planner.  From February 2001 through May 2002, Mary Villa was the Town Planner.  Defendants' Exhibit HH, Affidavit of Villa.

In June 2000, Attorney Mark Kepple had a meeting with Larkin whereby Attorney Mark Kepple complained to Larkin that Merry Charters was operating without a permit or an approved site plan.  See Plaintiffs' Exhibit 6, Meeting Report Form; Plaintiffs' Exhibit 4, Deposition of Larkin, pgs. 87-88.  Subsequently, Larkin went to the dock where the Mystic Belle was located and spoke with Shillo.  See Plaintiffs' Exhibit 4, Deposition of Larkin, pg. 43.  On June 27, 2000, Shillo had a meeting with Larkin and Donnelly.  See Plaintiffs' Exhibit 3, Deposition of Shillo, pg. 36; Plaintiffs' Exhibit 6, Meeting Report Form, dated June 27, 2000.  At that meeting, Larkin and Donnelly led Shillo to believe that the alleged violations were "no big deal."  See Plaintiffs' Exhibit 3, Deposition of Shillo, pg. 19.  They also told Shillo to "[j]ust come in, go through the process.  We like the operation.  We think it's a good thing for Mystic . . . . You'll get your permit."  Id.

After this meeting, on August 11, 2000, Shillo submitted an application for a special use permit.  See Defendants' Exhibit J.  On October 17, 2000, the Planning and Zoning Commission [hereinafter "Commission"] voted to deny the application without prejudice.  See Defendant's Exhibit N.  The Commission based its decision to deny the

application on the Department of Environmental Protection's (DEP) concerns and the

lack of parking.  See Defendants' Exhibit N; Defendants' Exhibit L.  In deciding to deny

the Plaintiffs' application, Donnelly determined that the Plaintiffs must provide fifteen

(15) parking spaces for its passengers and employees.  See Defendants' Exhibit M,

Transcript of Public Hearing, pg.11.  The zoning regulations do not provide the amount

of parking that is required for tour boats.  See Defendants' Exhibit I, pg. 47.

After the Commission denied the first application, the Plaintiffs secured fifteen

(15) parking spaces from St. Patrick's Church.  See Defendants' Exhibit Q, Letter to

Shillo from Linda Morales, dated October 12, 2000.  Shillo told Donnelly that he had

secured the parking spaces and Donnelly told him that he would need to submit

engineer drawings of the parking spaces with his second application.  See Plaintiffs'

Exhibit 1, Affidavit of Shillo.  As a result, Shillo retained an engineer who produced

drawings of the parking spaces.  Id.  Shillo then had a meeting with Donnelly whereby

Donnelly reviewed the engineer's drawings and told Shillo that he was all set.  Id.

Relying on Donnelly's statements at that meeting, the Plaintiffs submitted a

second application to the Commission on November 16, 2000. See Defendants' Exhibit

O.  The Plaintiffs met all of the DEP's concerns.  See Defendants' Exhibit P, Letter to

Commission from DEP, dated December 22, 2000.  In support of the application, the

DEP wrote:

> We find the proposed commercial tour boat operation would expand upon
> the intent of the existing public access easement area at the site by
> providing a new means for the public to enjoy the Mystic River.  This use
> is consistent with the CCMA policy which promotes uses within the
> coastal boundary which give highest priority and preference to water
> dependent uses . . . and encourage increased recreational boating.
> Defendants' Exhibit P.

The Plaintiffs notified the Commission that they had secure fifteen (15) parking

spaces from St. Patrick's Church.  See Defendants' Exhibit Q, Letter to Shillo from

Linda Morales, dated October 12, 2000.  According to Mary Villa, this parking was

located approximately 1200 to 1300 feet from the dock where the Mystic Belle was

located.  See Defendants' Exhibit S, Memo to Commission from Villa, dated May 15,

2001.  In response to the new application, Donnelly believed that the Plaintiffs' proposal

of fifteen (15) spaces at St. Patrick's Church was the best that Shillo could do.  See

Defendants' Exhibit T, Deposition of Donnelly, pg. 37.

A public hearing was held on March 20, 2001, to discuss the Plaintiffs'

application.  At this point, Villa had replaced Donnelly as the new Town Planner.  See

Defendants' Exhibit V, Deposition of Villa, pg. 23.  The Commission requested that Villa

send correspondence to the Town Attorney, Thomas Londregan, and request an

interpretation of the zoning regulations.  See Defendants' Exhibit W, Letter to

Londregan from Villa, dated February 12, 2001.  Specifically, the Commission was

interested in determining the scope of its authority to reduce parking requirements

under regulation 7.10.2.  See Defendants' Exhibit W.  As Villa indicates in the

correspondence to Attorney Londregan, "The Town of Stonington has allowed special

parking arrangements under this regulation in the past."  See Defendants' Exhibit W.

In response, through correspondence dated March 12, 2001, Attorney Londregan

stated that "[a]s a general principle, off-street parking on one's site is required.

However, the Stonington Regulations have an exception to the DB-5, CS-5 and LS-5

zones.  In the DB-5 zone the total parking requirement may be reduced by an amount or

area deemed proper for that use in question by the commission."  Defendants' Exhibit Z,

Letter to Villa from Londregan, dated March 12, 2001.  Attorney Londregan also

suggested that the Commission could put conditions on its decision to reduce the total

parking requirement, such as requiring the Plaintiffs to maintain a log of where its

customers park.  See Defendants' Exhibit Z.

In addition to the correspondence from Attorney Londregan, the Commission

also received correspondence from the Board of Police Commissioners, dated

December 21, 2000.  See Defendants' Exhibit AA, Letter to Commission from Board of

Police Commissioners, dated December 21, 2000.  In the one-sentence correspondence, the Board of Police Commissioners states: "At a special meeting on December 20, 2000, the Board of Police Commissioners reviewed the above-referenced application and expressed concern with the lack of adequate parking in the area."  Defendants' Exhibit AA.  The Board of Police Commissioners had "no comment" on the Plaintiffs' first application for a special use permit.  See Plaintiffs' Exhibit 12.

In a memorandum to the Commission dated May 15, 2001, Villa recommended that the Plaintiffs' application be denied "due to lack of adequate and appropriate parking."  See Defendants' Exhibit S.  The Plaintiffs' application was denied on May 15, 2001.  See Defendants' Exhibit DD.  Thayer, Lyon and Granato voted to deny the application while Strunk and Morrison voted to approve the application.  See Defendants' Exhibit DD.

On June 4, 2001, the Plaintiffs challenged the Commission's decision in Connecticut Superior Court.  See Defendants' Exhibit EE.  The Plaintiffs also applied for a variance with the Zoning Board of Appeals [hereinafter "ZBA"] on June 15, 2001.  See Defendants' Exhibit FF.  On June 22, 2001, Villa corresponded with Attorney Londregan, stating: "The Planning & Zoning Commission learned that Merry Charters has applied to the Zoning Board of Appeals to vary the parking regulations."  See

Defendants' Exhibit II, Letter to Londregan from Villa, dated June 22, 2001. The Commission also requested that Villa prepare a memorandum to the ZBA indicating that the Commission was against the granting of a variance. See Plaintiffs' Exhibit 7, Deposition of Villa, pg. 55-56. Villa testified that the purpose of the memorandum was to ensure that the Commission did not lose their power in applying the regulations. See Plaintiffs' Exhibit 7, Deposition of Villa, pg. 57. The Commission also wanted to remind the ZBA of how to do its business. See Plaintiffs' Exhibit 7, Deposition of Villa, pg. 61.

The memorandum was signed by Thayer. See Defendants' Exhibit LL. To date, this is the only memorandum that Thayer prepared and sent to the ZBA. See Plaintiffs' Exhibit 8, Deposition of Thayer, pg. 41. It is also the only memorandum or letter that Sullivan ever received from Thayer. See Plaintiffs' Exhibit 9, Deposition of Sullivan, pg. 42.

On August 14, 2001, the ZBA held a public hearing regarding the Plaintiffs' application for a variance. See Defendants' Exhibit GG. The Plaintiffs' application for a variance was subsequently denied on September 11, 2001. See Defendants' Exhibit NN, Notice of Decision. Sullivan voted to deny the Plaintiffs' request for a variance. The basis of the ruling was that there was a lack of parking provided. See Defendants' Exhibit NN.

Without the proper permits, Shillo was ultimately forced to sell the Mystic Belle. See Plaintiffs' Exhibit 3, Deposition of Shillo, pgs. 122-23. Before selling the boat, however, Shillo attempted to find several alternative docks from which to run the business. See Plaintiffs' Exhibit 3, Deposition of Shillo, pg. 61-66. Throughout the process surrounding the Plaintiffs' zoning applications, Shillo was being given the "hometown treatment" by the members of the Commission and the ZBA. See Plaintiffs' Exhibit 3, Deposition of Shillo, pg. 76-77. He was also refused parking because he was an outsider. Id. Additionally, Shillo was refused parking because he was not a property owner. See Plaintiffs' Exhibit 8, Deposition of Thayer, pgs. 54-55.

The Town of Stonington has a history of distributing parking spaces on the basis of who was requesting the parking spaces. See Plaintiffs' Exhibit 3, Deposition of Shillo, pg. 76-77. Moreover, the Town of Stonington is run by a "good-old-boys network." See Plaintiffs' Exhibit 7, Deposition of Villa, pg. 88-89. By its own employee's admission, employees of the Town and members of the Commission and ZBA will "look the other way" on certain zoning violations. See Plaintiffs' Exhibit 4, Deposition of Larkin, pg. 63.

**III.    LAW AND ARGUMENT**

    **A.    Standard of Review**

12

Summary judgment is appropriately granted when the evidentiary record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. Rule of Civ. Pro. 56 (c).  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims . . . (and) it should be interpreted in a way that allows it to accomplish this purpose."  Celotex v. Catrett, 477 U.S. 317, 323-24, 106 S.Ct, 91 L.ED. 2d 265 (1986).  Thus, "[o]nly when reasonable minds could not differ as to the impact of the evidence is summary judgment proper.  Bryant v. Mafucci, 923 F.3d 979 (2d Cir. 1991) cert. denied 502 U.S. 849 (1991).

While the court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion; Matushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed. 2d 538 (1986); a party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986) cert. denied 480 U.S. 932 (1987).  Additionally, "mere conclusory allegations or denials in legal memoranda or oral argument are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise

exist." Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir. 1980)

(quoting LEC v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir. 1978).

### B.    Injunction as Moot

The Defendants argue that the Plaintiffs are not entitled to injunctive relief

because Shillo no longer owns a tour boat and no longer holds a lease to the dock.  The

Plaintiffs concede that because of these facts, they are not entitled to injunctive relief.

### C.    Defendants are not entitled to absolute immunity

The individual Defendants assert that they are entitled to absolute immunity on

the Plaintiffs' § 1983 claims.  Specifically, the Defendants argue that they are absolutely

immune from the Plaintiffs' claims because they were performing quasi-judicial or

judicial functions when they denied the Plaintiffs' applications.  While the Defendants

cite to numerous cases that they claim support their contention, none of these cases are

from the Second Circuit or Connecticut.

In Connecticut, the District Court has held that "[w]hen acting upon an application

for a special permit, the zoning commission acts in an administrative, rather than a

legislative or quasi-judicial, capacity." Murphy v. Zoning Commission of the Town of

New Milford, 223 F. Supp. 2d 377, 386, n.11 (D.Conn. 2002) (citing A.P. & W Holding

Corp. v. Planning & Zoning Board, 167 Conn. 182, 184-85, 355 A.2d 91 (1974).  A

zoning commission acts in an administrative capacity when it determines "whether the applicant's proposed use is expressly permitted under the regulations, and whether the standards set forth in the regulations and the statute are satisfied."  <u>A.P. & W Holding Corp.</u>, 167 Conn. at 185.

In this instance, the Plaintiffs filed two (2) applications for special use permits. See Defendants' Exhibit J; Defendants' Exhibit O.  The individual Defendants, along with the other members of the Commission and ZBA, had the duty to determine whether the applications were permitted under the Town's regulations and statutes.  Therefore, when the Defendants were deciding whether to grant or deny the Plaintiffs' applications, they were acting in an administrative capacity.  As such, they are not entitled to absolute immunity on the Plaintiffs' § 1983 claims.

### D.    The Defendants Are Not Entitled To Judgment On The Plaintiffs' Equal Protection Claims

The Fourteenth Amendment provides "nor shall any State . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.  "The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents."  (Internal quotation marks omitted.)  <u>Sioux City Bridge, Co. v.</u>

<u>Dakota County</u>, 260 U.S. 441, 445, 43 S. Ct. 190, 67 L. Ed. 340 (1923).  "The Equal
Protection Clause . . . is essentially a direction that all persons similarly situated should
be treated alike."  <u>Zahra v. Town of Southold</u>, 48 F.3d 674, 683 (2d Cir. 1995).

 The equal protection clause is violated where there is selective enforcement
based on an impermissible reason.  For example, the equal protection clause is
implicated where "a town enforces a previously dormant zoning regulation against only
those of a certain race, religion, or political affiliation."  <u>LaTrieste Restaurant and
Cabaret v. Village of Port Chester</u>, 40 F.3d 587, 590 (2d Cir. 1994).  The equal
protection clause is also implicated where a law is applied against a plaintiff "differently
than other similarly situated people."  <u>Monatuck Associates v. Wendt</u>, 1996 WL
1056726 (D.Conn. 1996) (equal protection claim based on discriminatory treatment in
denying zoning permits)(Attached hereto).  In determining whether the equal protection
clause has been violated, the courts have adopted a two-part test regarding selective
enforcement.  A violation of the equal protection clause based on selective enforcement
occurs where "(1) the person, compared with others similarly situated, was selectively
treated; and (2) that such selective treatment was based on impermissible
considerations such as race, religion, intent to inhibit or punish the exercise of
constitutional rights, or malicious or bad faith intent to injure a person."  <u>Id</u>.

### 1.    Part One of Test

In order to satisfy the first part of the test, Merry Charters must show that it was treated differently than others that are similarly situated.   "[T]he requirement imposed upon [p]laintiffs claiming an equal protection violation [is that they] identify and relate specific instances where persons situated similarly in all *relevant* aspects were treated differently."  (Emphasis in original; citation omitted; internal quotation marks omitted.) Cadlerock Properties Joint Venture, L.P. v. Commissioner, 253 Conn. 661, 672, 757 A.2d 1, cert. denied, 531 U.S. 1148, 121 S. Ct. 1089, 143 L. Ed. 2d 963 (2000).

The Plaintiff's company, Merry Charters, is similarly situated to a restaurant and two (2) other tour-boat and sightseeing businesses.   The restaurant, Anthony J's, is located at 6 Holmes Street on the same street as the Mystic Belle's dock.  See Affidavit of Shillo.  Anthony J's has twenty-one (21) parking spaces on Holmes Street and "no off-street parking."  See Plaintiffs' Exhibit 10, Commission's Notes regarding application of Trader Jack's, PZ0113SUP.  To date, the Commission has not issued a Notice of Violation for Anthony J's or forced the restaurant to secure on-site parking as it has forced the Plaintiffs' to secure such parking.  See Plaintiffs' Exhibit 1, Affidavit of Shillo.

With regard to the tour boats, the Town has treated the Plaintiffs differently than it has treated the Mystic River Queen and the Argia.  Although the Mystic River Queen is

no longer in business, it operated on the Mystic River in Stonington, Connecticut.  See Plaintiffs' Exhibit 1, Affidavit of Shillo.  While the Mystic Belle's capacity was fifty-seven passengers, the Mystic River Queen's capacity was sixty passengers.  See Plaintiffs' Exhibit 11, pg. 101.  Additionally, the Mystic River Queen and the Mystic Belle both offered one (1) hour trips down the river, about five (5) times a day.  See id.; see also Plaintiffs' Exhibit 1, Affidavit of Shillo.  The boats are also similar in that they were both equipped with a sanitary system.  See id.

In 1990, the Mystic River Queen had a similar parking issue to the Merry Charters issue.  On May 22, 1990, the Zoning Board of Appeals determined that the appropriate number of parking spaces for the Mystic River Queen was four (4) spaces. See Plaintiffs' Exhibit 11, ZBA minutes, dated May 22, 1990, pg. 112.  The Town's own employee asserted that the decision in the Mystic River Queen application set the precedence for the present matter because the two (2) businesses performed similar activities.  See Defendants' Exhibit S.  According to Villa, who was the Town Planner in 2001, the decision in the Mystic River Queen application "established a similar activity to the activity proposed in the subject application required 3-4 on-site parking spaces." See id.

Despite the determination by the Town Planner, Villa, that Merry Charters was similarly situated to the Mystic River Queen, the Commission refused to apply the same requirements to Merry Charters that it did to the Mystic River Queen. Instead of requiring the Plaintiffs to obtain three (3) or four (4) parking spaces, the Commission compared Merry Charters to a restaurant and determined that the Plaintiffs must obtain fifteen (15) parking spaces.

Merry Charters is also similarly situated to the Argia. The Argia is a tour boat that is currently operated on the Mystic River in Stonington, Connecticut, and is located at a dock approximately 100 yards from the dock where the Plaintiffs' boat was previously located. See Plaintiffs' Exhibit 4, Deposition of Larkin pg. 199. The Argia not only operates at almost the same location as Merry Charters, but it also sells tickets for rides on the tour boat at the same places that Merry Charters sold tickets for tours on its boat, the Mystic Belle. See Plaintiffs' Exhibit 1, Affidavit of Shillo. Unlike Merry Charters and the Mystic River Queen, there is no indication that the Argia was required to apply for a special use permit or a variance. See Plaintiffs' Exhibit 4, Deposition of Larkin, pg. 197.

Moreover, Joseph Larkin, the Zoning Enforcement Officer, testified that the Argia was not required to obtain such a permit because the Argia was docked at a dock that

had been historically used for commercial businesses.  See Plaintiffs' Exhibit 4,

Deposition of Larkin, pg. 197-98.  The dock where the Mystic Belle was located,

however, had also historically been used for commercial boats.  See Plaintiffs' Exhibit 4,

Deposition of Larkin, pg. 232-33; Plaintiffs' Exhibit 5, Public Hearing Transcript, pgs. 22-

23, 27-28.

Merry Charters is similar to Anthony J's, the Argia and the Mystic River Queen in

all relevant and material aspects.  Therefore, the Plaintiffs have met the requirements of

the first part of the equal protection test.

### 2.    Part Two of Test

With regard to part two of the test, there is a split of authority on whether the

malice requirement still needs to be satisfied.  In Village of Willowbrook v. Olech, 528

U.S. 562, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000), the Supreme Court held that

allegations of "irrational and wholly arbitrary" government action are sufficient to state

an equal protection claim without inquiry into the defendants' subjective motivation.  Id.

at 565.  The Second Circuit held that Olech "did not remove the requirement that a

plaintiff alleging an equal protection violation based on selective enforcement show that

the governmental action at issue was motivated by personal animus."  Harlan

Associates v. Incorporated Village of Mineola, 273 F.3d 494, 500 (2d cir. 2001).

Thus far, the Second Circuit has refused to make a decision on whether the irrational and wholly arbitrary standard from <u>Olech</u> or the traditional standard of malice and bad faith applies.  However, in <u>Padilla v. Hayes</u>, 2002 WL 750856 (D.Conn. April 24, 2002), the District Court, *Arterton, J.*, held that "[t]he court cannot ignore the plain language of the Supreme Court in <u>Olech</u> that allegations that a plaintiff had been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment were sufficient to state a claim for denial of equal protection . . . . Plaintiff's allegations here that [t]he disparate treatment to which the defendants subjected the plaintiff was arbitrary, intentional and irrational . . . are sufficient under <u>Olech</u> to survive a motion to dismiss."  <u>Id</u>. (Attached hereto).

Following <u>Padilla</u>, the District Court in New York stated that "in <u>Padilla v. Harris</u> . . . the court engaged in a thorough examination of the available jurisprudence, and concluded that <u>Willowbrook</u> foreclosed the possibility of requiring evidence of ill will to survive a motion for summary judgment."  (Citations omitted; internal quotation marks omitted.)  <u>Payne v. Huntington Union Free School District</u>, 219 F. Sup. 2d 273, 278 (E.D.N.Y. 2002).[1]  Despite this statement, however, the court did not adopt one

---

[1] In <u>Payne</u>, the Plaintiff was hired to teach an English class part-time, for one year, in the district where her husband was the superintendent.  After teaching for the year, the Plaintiff's principal wanted her to teach full time.  The Board, however, had determined that it did not want the Plaintiff to work in the same district where her husband was the superintendent.  The Board told the Plaintiff's husband that it did not want him to recommend her for another appointment and he followed their request.  The Plaintiff then filed suit alleging, among other things, a violation of the equal protection clause based on selective treatment.

standard over the other, but rather looked for evidence of both irrational and arbitrary behavior and ill will and malice.

If the standard is that the zoning board's decision must be irrational, the Plaintiff must show that the board acted "with no legitimate reason for its decision."  Harlan, 273 F.3d at 502.  If the standard is one of malice, the Plaintiff must demonstrate certain facts that indicate the board acted with malice.  Id.  "A demonstration of different treatments from persons similarly situated, without more, would not establish malice or bad faith."  Crowley, 76 F.3d at 53.  Moreover, the Plaintiff's claims of malice cannot be speculative.  Id.

Assuming that Merry Charters must allege and prove that the Zoning Board acted with ill will and malice, it must prove, at a minimum, that the Zoning Board acted intentionally in treating it differently from others similarly situated.  See Payne, 219 F. Sup. 2d at 281.  In Payne, the Plaintiff failed to demonstrate that the conduct she complained of was intentional. The court held that the Plaintiff offered no evidence that the Board knew it was treating her differently than it treated other similarly situated individuals.  Id.  The court determined that the plaintiff must show that there was "active malicious ill will toward her."  Id. at 283.

In <u>Harlen</u>[2], the Second Circuit held that the Plaintiff did not provide sufficient evidence to support an inference of ill will or malice.  In making its decision, the court pointed out that the Plaintiff failed to identify any animus on the part of the zoning board directed at him personally.  <u>Harlan</u>, 273 F.3d at 502-503.  The court stated that "there is insufficient evidence of malice for Harlen's equal protection claim to survive summary judgment.  Harlen's contention that the Board's action was motivated by community animus against 7-Eleven to deny the application has no significant basis in fact.  The record makes clear that the Board had signaled its decision to deny the permit based on child safety and traffic concerns well before any public comments were solicited.  Beyond that, the bulk of the public comments were directed toward legitimate concerns of child safety and traffic density . . . . None of the public statements evinced personal animus toward Harlen, and only a small fraction of them were critical of 7-Eleven franchises generally."  <u>Id.</u> at 503.

The Plaintiffs submit that determining whether the Defendants acted with malice or bad faith is inappropriate on a motion for summary judgment.  Generally, determining whether malice or bad faith exists is a question of fact which should be resolved at trial.

---

[2] In <u>Harlen</u>, the Plaintiff submitted an application for a special use permit to construct a 7-Eleven.  The Zoning Board denied the application.  "The decision cited nine reasons for the denial, including the proximity of the property to a number of local schools, increased traffic, the potential threat to child safety, intrusion on the surrounding residential area and an increased danger to pedestrians generally."  <u>Harlen</u>, 273 F.3d at 498.  The Plaintiff filed suit, claiming "that the Board had violated its rights to equal protection and substantive due process granted by the United States Constitution." Id.

See <u>McKay v. Mad Murphy's, Inc.,</u> 899 F. Supp. 872, 882 (D. Conn. 1995).  "The intent of the parties . . . is purely a question of fact . . . . Ordinarily, such issues are inappropriate for summary judgment."  (Citations omitted; internal quotation marks omitted.)  <u>Citizens Bank of Clearwater v. Hunt</u>, 927 F.2d 707, 711 (2d Cir. Conn. 1991).  "However, the mere incantation of intent or state of mind [does not] operate as a talisman to defeat an otherwise valid [summary judgment] motion . . . . Rather, [t]he state of mind exception . . . is appropriate only where solid circumstantial evidence exists to prove plaintiff's case." (Citations omitted; internal quotation marks omitted.)  <u>Id</u>.

The Plaintiffs submit that there is evidence that suggests that the Defendants acted with malice and bad faith and that they acted arbitrarily when they denied the Plaintiffs' zoning applications.  Unlike in <u>Harlan</u>, the Defendants in the present case led the Plaintiffs to believe from the beginning that they were going to approve the Plaintiffs' application.  On June 27, 2000, Shillo had a meeting with Larkin and Donnelly.  At that meeting, Larkin and Donnelly led Shillo to believe that the alleged violations were "no big deal."  See Plaintiffs' Exhibit 3, Deposition of Shillo, pg. 19.  They also told Shillo to "[j]ust come in, go through the process.  We like the operation.  We think it's a good thing for Mystic . . . . You'll get your permit."  <u>Id</u>.

After this meeting, Shillo believed his zoning application would be approved.  Id.

Therefore, Shillo submitted an application for a zoning permit.  Despite Larkin and

Donnelly's assertions, this application was denied without prejudice.  The denial without

prejudice encouraged Shillo to submit another application.  See Plaintiffs' Exhibit 8,

Deposition of Thayer, pgs. 34-35.  The basis for the denial was the concerns of the DEP

and lack of adequate parking.  The Commission also arbitrarily determined that the

Plaintiffs must provide fifteen (15) parking spaces as opposed to the three (3) to four (4)

spaces that it had required the Mystic River Queen to provide.

Shillo submitted a second application that addressed the concerns that the

Commission laid out when it denied the first application.  Prior to the submitting the

application, Shillo again met with Donnelly who reviewed the engineer drawings of the

parking spaces.  At the meeting, Donnelly told Shillo that Shillo was all set to file a

second application.  See Plaintiffs' Exhibit 1, Affidavit of Shillo.

In the second application, Shillo addressed the concerns of the DEP and

obtained fifteen (15) parking spaces at St. Patrick's Church.  Despite these

achievements, the Commission denied the second application.  The Commission

founded its denial on the basis that there was no on-site parking as required under

regulations 7.10; the application was unable to provide adequate parking; off-site

parking is not expressly permitted in the regulations and is thus prohibited; and approval of the application may contribute to existing problems of parking and congestion, as well as threaten people's safety.

      The Commission's basis for the denial of the second application was unfounded. As Larkin testified the regulations do not explicitly require a business to have on-site parking.  See Plaintiffs' Exhibit 4, Deposition of Larkin, pg. 186.  Moreover, even though the Commission claimed off-site parking was not permitted by the regulations, the Commission itself suggested to Shillo that he find parking.  See Plaintiffs' Exhibit 1, Affidavit of Shillo.  The Commission never specified that the parking had to be on-site. See Plaintiffs' Exhibit 1, Affidavit of Shillo.  Additionally, there is nothing in the zoning regulations that suggests that Merry Charters was violating any regulation by obtaining parking at St. Patrick's Church.  See Plaintiffs' Exhibit 7, Deposition of Villa, pg. 63. The Chairman himself testified that he did not have a problem with the off-site parking at the church.  See Plaintiffs' Exhibit 8, Deposition of Thayer, pg. 32-33.   With regard to the safety and traffic congestion concerns, Villa testified that she did not do anything to determine how much more traffic would be generated by Merry Charters.  See Plaintiffs' Exhibit 7, Deposition of Villa, pg. 46.  Rather, she merely reviewed a police report that

indicated that parking violations in Mystic had increased.  See Plaintiffs' Exhibit 7, Deposition of Villa, pg. 47.

In addition to maliciously denying the second application, the Commission also maliciously interfered with the Plaintiffs' rights to apply for a variance at the ZBA.  The ZBA and the Commission are two separate bodies, independent of each other. See Plaintiffs' Exhibit 7, Deposition of Villa, pg. 57.  Because of this independence, the Commission is not in the habit of informing the ZBA of its position.  See Plaintiffs' Exhibit 9, Deposition of Sullivan, pg. 47.  Generally, there is no interaction between the Chairman of the Commission and the ZBA.  See Plaintiffs' Exhibit 8, Deposition of Thayer, pg. 45.  Despite the separation of the two bodies, the Commission involved itself with the Plaintiffs' application process at the ZBA level.  Although the ZBA did not receive letters from the Commission on a regular basis; see Plaintiffs' Exhibit 9, deposition of Sullivan, pg. 36; the Commission instructed Villa to construct a letter to the ZBA informing the ZBA of the Commission's position on the Plaintiffs' application.  According to Thayer, the purpose of the letter was to get the Commission's and the ZBA's "stories straight" on the Plaintiffs' various zoning applications.  See Plaintiffs' Exhibit 8, Deposition of Thayer, pg. 41.  Villa also testified that the letter was

constructed because the Commission wanted the Plaintiffs' application denied by the ZBA.  See Plaintiffs' Exhibit 7, Deposition of Villa, pg. 80.

This letter was the only letter that the Commission has addressed to the ZBA, informing the ZBA as to its position.  Sullivan testified that he has never received any letters from the Commission beside the letter relating to the Plaintiffs' application.  See Plaintiffs' Exhibit9, Deposition of Sullivan, pg. 36.  Thayer also testified that he had never written a letter to the ZBA besides the letter relating to the Plaintiffs' application.  See Plaintiffs' Exhibit 8, Deposition of Thayer, pg. 41.

The Commission also acted with malice and bad faith when it refused to follow the Town Attorney's opinion.  As stated previously, the Commission requested that Villa request an opinion from Attorney Londregan regarding the Plaintiffs' application for parking reduction under 7.10.2.  In the letter to Attorney Londregan, Villa explicitly states that the Plaintiffs are unable to provide on-site parking but are able to provide fifteen (15) spaces at St. Patrick's Church.  Villa also notes that the Town "has allowed special parking arrangements under this regulation [7.10.2] in the past."  Defendants Exhibit T.

In response to the Commission's request, Attorney Lodregan determined that the Commission could grant the Plaintiffs' application and request for parking reduction.

Attorney Londregan stated that the Town can reduce the amount of on-site parking under 7.10.2. He also detailed certain conditions that the Commission may put on the parking permit, such as not using the parking lot at the church during mass. See Defendants' Exhibit Z. Despite Attorney Londregan's opinion to the contrary, Villa concluded that the zoning regulations do not permit off-site parking. See Defendants' Exhibit S.

Although the Commission had the policy of following the Town Attorney's opinion; Plaintiffs' Exhibit 8, Deposition of Thayer, pgs. 25-26; this was the first time that the Commission has ever declined to follow the opinion of the Town Attorney. See Plaintiffs' Exhibit 4, Deposition of Larkin, pg. 115. Instead of following its policy as it had in every other instance, the Commission blatantly disregarded the Town Attorney's opinion in this situation. Villa's letter to the Commission on May 15, 2001, as well as the Commission's decision to deny the application both rested on the fact that the regulations do not provide for off-site parking. Attorney Londregan, however, did not conclude that the zoning regulations prohibit off-site parking. By refusing to follow Attorney Londregan's opinion, the Defendants acted with malice when they arbitrarily denied the Plaintiffs' application.

The Plaintiffs submit that there is a genuine issue of material fact demonstrating that the Defendants acted with malice and bad faith when they addressed the Plaintiffs' zoning applications.  The Plaintiffs also submit that there is a genuine issue of fact demonstrating that the Defendants acted irrationally and arbitrarily when they addressed the Plaintiffs' zoning applications.  Therefore, the Defendants are not entitled to summary judgment on the Plaintiffs' equal protection claims.

### E.    The Individual Defendants are not entitled to qualified immunity on the Plaintiffs' equal protection claims

The individual Defendants improperly argue that they are entitled to qualified immunity on the Plaintiffs' equal protection claims.  The Plaintiffs do not dispute that there are instances where a public official is entitled to qualified immunity.  "The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation."  Hope v. Pelzer, 536 U.S. 730, 736, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002).  "Qualified immunity would be defeated if an official knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury."  Harlow v. Fitzgerald, 457 U.S. 800, 814, 102 S. Ct. 2727, 73 L. Ed 2d 396 (1982).

"At the time of the events in question, it was clearly established that selective enforcement of a facially valid law based on an official's dislike . . . is unlawful." See Sidepockets, Inc. v. McBride, District Court, Docket No. 3:03CV742 (RNC)(*Chatigny, J.* March 15, 2004)(Attached hereto).  "It is well settled that enforcement of an otherwise valid zoning ordinance violates the Constitution . . . if . . . the decision of the particular zoning body is arbitrary, . . . or if the ordinance is applied or enforced with a discriminatory intent or purpose." (Internal quotation marks omitted.)  Brady v. Town of Colchester, 863 F.2d 205, 217 (2d Cir. 1988).

Taking the Plaintiffs' allegations as true, the Defendants violated the Plaintiffs' constitutional right to equal enforcement of the law when they selectively enforced the zoning regulations against the Plaintiffs.  Moreover, the Defendants acted arbitrarily when they denied the Plaintiffs' zoning applications.  Thus, the Defendants are not entitled to qualified immunity on the Plaintiffs' equal protection claims.

### F.    Due Process

The Plaintiffs allege that the Defendants violated their due process rights.  "[A] party asserting a deprivation of substantive due process must first establish a valid property interest within the meaning of the Constitution . . . . Second, the party must demonstrate that the defendant acted in an arbitrary or irrational manner in depriving

him of that property interest." (Citations omitted.) <u>Crowley</u>, 76 F.3d at 52. "In order to establish a constitutionally cognizable property interest, a litigant must demonstrate as legitimate claim of entitlement to the benefit in question." (Internal quotation marks omitted.) <u>Id.</u> (quoting <u>Zahara v. Town of Southbold</u>, 48 F.3d 674, 680 (2d Cir. 1995)).

The strict entitlement test requires that the plaintiff prove that there was a "certainty or very strong likelihood of issuance." (Internal quotation marks omitted.) <u>RRI Realty Corp. v. Incorporated Village of Southampton</u>, 870 F.2d 911, 918 (2d Cir. 1989). The test "must focus primarily on the degree of discretion enjoyed by the issuing authority, not the estimated probability that the authority will act favorably in a particular case." <u>Id</u>. "The 'strong likelihood aspect' . . . comes into play only when the discretion of the issuing agency is so narrowly circumscribed that approval of a proper application is virtually assured; an entitlement does not arise simply because it is likely that broad discretion will be favorably exercised." <u>Id</u>.

The Plaintiffs submit that they have a constitutionally protected interested in the zoning variance and parking permits that they requested from the Commission and the ZBA. The Second Circuit has held that "a party may have a constitutionally protectible property interest in a benefit that affects land use—i.e., a building permit, certificate of occupancy, zoning variance, excavation permit or business license." <u>Zahara</u>, at 681.

The zoning regulations suggest that the Commission and the ZBA did not have broad discretion to deny the Plaintiffs' zoning applications.  7.10.2 states:

> In DB-5, CS-5, LS-5, and RH-1- Districts, the total parking requirement may be reduced by an amount equal to the public parking area immediately adjacent to the site, or an amount or area deemed proper for that use in question by the Commission.  The Commission shall use the findings from Special Use Permit requirements as guidelines.  See Defendants' Exhibit UU.

The regulations regarding Special Use Permits provide that the Commission must find that certain requirements are met by the proposal, including adequate water supply; adequate safety equipment; adequate transportation services; no dangerous elements to the residents; no adverse effects on the character of the district, property values, historic features, prosperity, and the health safety and welfare of the public; no negative impact on environmental resources; and compliance with all regulations and the Town's Plan of Development.  See Defendants' Exhibit UU, 6.4.1- 6.4.8.  The Commission and the ZBA are obligated to determine if the guidelines in 6.4 are met by an application.  If the guidelines are met, the parking requirement should be reduced under 7.10.2.

There is no indication that the Plaintiffs' proposals violated any of the guidelines provided in 6.4.1 through 6.4.8.  Although the Commission claimed that the Plaintiffs'

application was denied because of traffic concerns, this claim was unfounded.  There is

no evidence that anyone independently determined that having parking at St. Patrick's

Church would increase the traffic.  See Plaintiffs' Exhibit 7, Deposition of Villa, pg. 46.

In addition to meeting the guidelines in 6.4, the Commission also had a history of

allowing special parking arrangements under 7.10.2.  See Plaintiffs' Exhibit 8,

Deposition of Thayer, pg. 61; Defendants' Exhibit W.  It also had a precedence of

reducing the amount of parking to four (4) spaces for a tour boat business.  Moreover,

the Commission had a history of following the Town Attorney's opinion.

The Plaintiffs submit that they had an entitlement in the parking permit and

variance.  Given that all the guidelines contained in 6.4 were met, the Defendants

should have granted the Plaintiffs' applications.  There is a genuine issue of material

fact demonstrating that, rather than follow the regulations and its own precedence, the

Defendants arbitrarily and irrationally denied the Plaintiffs' applications.  Therefore, the

Defendants are not entitled to judgment in their favor on the Plaintiffs' due process

claims.

**G.    The Individual Defendants Are Not Entitled To Qualified Immunity On
The Plaintiffs' Due Process Claim**

The Defendants are not entitled to qualified immunity on the Plaintiffs' due

process claims.  The Plaintiffs are "protected from arbitrary action of towns through their

officials by the due process clause of the Constitution.  An arbitrary decision is one made without adequate determining principle or was unreasoned."  (Internal quotation marks omitted.)  <u>TLC Development, Inc. v. Town of Branford</u>, 855 F. Supp. 555, 558 (D. Conn. 1994).  "A finding of arbitrariness not only establishes a due process violation but precludes a defense of qualified immunity."  <u>Id.</u> at 558.

Taking the Plaintiffs' factual allegations as true, the Plaintiffs have established that the Defendants violated their due process rights.  Moreover, an issue of fact exists indicating that the Defendants acted arbitrarily when they decided to deny the Plaintiffs' applications.  Therefore, the Defendants' claim of qualified immunity must be defeated. The Defendants are not entitled to judgment in their favor on the Plaintiffs' due process claims.

### H.    The Defendants Are Not Entitled To Qualified Immunity On Shillo's Claim Of Emotional Distress

The Defendants argue that they are protected from Shillo's claim of negligent infliction of emotional distress under the doctrine of governmental immunity.  General Statutes § 52-557n (b) provides in relevant part that "a political subdivision of the state or any employee, officer or agent acting within the scope of his employment or official duties shall not be liable for damages to person or property resulting from . . . (7) the issuance, denial, suspension or revocation of, or failure or refusal to issue, deny,

suspend or revoke any permit, license, certificate, approval, order or similar authorization, when such authority is a discretionary function by law, unless such issuance, denial, suspension or revocation or such failure or refusal constitutes a reckless disregard for health or safety."  Connecticut General Statutes § 52-557n (b) (7).

The Defendants claim that they are immune from Shillo's emotional distress claim because they were engaged in a discretionary act when they denied his zoning applications.  The Plaintiffs assert, however, that the Defendants were engaged in ministerial acts rather than discretionary acts when they ruled on the applications.  In Robishaw v. Murphy, Superior Court, Docket Number X07CV000073137S (*Bishop, J.* September 28, 2000)(attached hereto), the court rejected the defendant's contention that he was entitled to immunity under § 52-557n against a claim that he failed to enforce certain zoning regulations.  The court held that the plaintiffs' allegations "go beyond mere assertions of negligence or the inadequacy of inspections, which would be discretionary in nature entitling a municipal employee to immunity.  The plaintiffs' allege . . . violations of specific sections of the Town's zoning regulations.  Taken on their face . . . these appear to be allegations of a failure to act in a prescribed manner or failure to perform ministerial acts."  Id.

As in <u>Robishaw</u>, the Plaintiffs allege specific regulations that the Defendants violated when they improperly denied the zoning applications.  Specifically, in the Amended Complaint, the Plaintiffs repeatedly cite 7.10.2 in support of their claims against the Defendants.  Moreover, as stated above, in section III F, the Defendants did not have discretion to deny the Plaintiffs' applications.  The Defendants had the duty to act in the prescribed manner as set forth in the zoning regulations.  Therefore, they were engaged in ministerial acts when they denied the Plaintiffs' zoning applications.  As such, they are not entitled to governmental immunity on Shillo's claim of negligent infliction of emotional distress.

The Defendants also argue that the individual Defendants, Thayer and Sullivan, are entitled to immunity under § 52-557n (c).  Section 52-557n provides that a person "who serves as a member of any board, commission, committee or agency of a municipality and who is not compensated for such membership on a salary or prorated equivalent basis, shall not be personally liable for damage or injury . . . resulting from any act, error or omission made in the exercise of such person's policy or decision-making responsibilities on such board, commission, committee or agency if such person was acting in good faith, and within the scope of such person's official functions and duties . . . .  The provisions of this subsection shall not apply if such damage or injury

was caused by the reckless, wilful or wanton misconduct of such person."  General Statutes § 52-557n (c).

Through the plain language of § 52-557n (c), the individual Defendants are not protected from liability unless they acted in good faith.  Furthermore, they are not protected from liability where they acted recklessly, willfully, or wantonly in the course of their official conduct.  As the Plaintiffs argue in section III D infra, there is a question of fact as the whether the Defendants acted maliciously and with bad faith intent when they encountered the Plaintiffs' applications.  Therefore, the individual Defendants are not entitled to immunity under § 557n (c).  Furthermore, the individual Defendants are not entitled to judgment in their favor on the Plaintiffs' claims of negligent infliction of emotional distress.

**I.    Shillo's Claim Of Negligent Infliction Of Emotional Distress Is Not Barred By The Statute Of Limitations**

The Defendants allege that Shillo's claims of negligent infliction of emotional distress against the Commission and Thayer are barred by the statute of limitations. The Plaintiffs do not dispute that the appropriate statute of limitations period is two (2) years "from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered."  General Statutes § 52-584.  The Plaintiffs, however, do dispute that the statute of limitations period ran out prior to the

Plaintiffs' bringing the negligent infliction of emotional distress claim.  A Motion for Summary Judgment may be granted when "material facts concerning the statute of limitations [are] not in dispute."  Burns v. Hartford Hospital, 192 Conn. 451, 452, 472 A.2d 1257 (1984).

The Defendants argue that the statute of limitations period began running when Thayer and the Commission denied the Plaintiffs' second application on May 15, 2001. The Plaintiffs, however, allege in the Amended Complaint that the Commission and Thayer inflicted emotional distress on Shillo when Thayer, on behalf of the Commission, sent a letter to the ZBA, dated July 31, 2001.  The claim of negligent infliction of emotional distress began to run when Thayer and the Commission sent this letter to the ZBA.  As such, the Plaintiffs were within the statute of limitations period when they filed the Second Amended Complaint, dated July 25, 2003, which contained the claim of negligent infliction of emotional distress.

The Plaintiffs submit that there is a genuine issue of material fact regarding when the statute of limitations period began to run.  As such, the Defendants are not entitled to judgment in their favor on the claims for negligent infliction of emotional distress.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, the Plaintiffs, Carl Shillo and Merry Charters, LLC,

submit that the court should deny the Defendants' Motion for Summary Judgment.

THE PLAINTIFFS,
MERRY CHARTERS, LLC and
CARL SHILLO


By:_____
JOSEPHINE A. SPINELLA
Silvester & Daly
72 Russ Street
Hartford, CT 06103
Tel. (860) 278-2650
Federal Bar No. CT24009


## <u>CERTIFICATION</u>

I, Josephine A. Spinella, attorney for the Plaintiff, hereby certify that a copy of the foregoing has been mailed, postage prepaid, in the United States Mail, this 5th day of May, 2004 to:

Melinda Powell, Esq.
Howd & Ludorf
65 Wethersfield Avenue
Hartford, CT 06114

By:_____
JOSEPHINE A. SPINELLA
Silvester & Daly

shillo-merry/supp disclosure expert.012604