UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MERRY CHARTERS, LLC and CARL SHILLO | : | |
| Plaintiff | : | CIVIL ACTION NO. |
| | : | 3:02CV336(MRK) |
| v. | : | |
| | : | |
| TOWN OF STONINGTON, STONINGTON PLANNING & ZONING COMMISSION, ZONING BOARD OF APPEALS OF THE TOWN OF STONINGTON, EDWARD T. SULLIVAN and GEORGE THAYER | : | |
| Defendants | : | MAY 5, 2004 |

**LOCAL RULE 56(a)2 STATEMENT**

**I.   Plaintiffs' Responses to Defendants Local Rule 56 (a) 1 Statement**

1. Admitted.

2. Admitted.

3. Admitted.

4. Admitted.

5. Admitted.

6. Admitted.

7. Admitted.

8. Admitted.

9. Admits so much of Paragraph 9 of the Local Rule 56 (a) 1 Statement as reads, "A 'visual easement' of the Mystic River was also deeded in favor of the Town. Id". As to the second part of ¶ 9, the admit that Larkin testified that he recalls that "there has been a stipulation on the use of the dock, in that it could not be used as a commercial dock without permits." See Defendants' Exhibit C.

10. Admitted.

11. Admitted in as much as the permit was granted with the stipulation that there would be no increase in the seating without the Commission's approval. See Defendants' Exhibit F.

12. Admitted in as much as a stipulation was entered that any commercial use of the dock was not permitted without a zoning permit and other permits and reviews as necessary. See Defendants' Exhibit F.

13. Admitted.

14. Admitted.

15. Admitted.

16. Admitted.

17. Admitted.

18. Admitted.

19. Admitted.

20. Admitted.

21. Admitted in as much as the record reflects that Mr. Donnelly said that Shillo could use the restaurant parking if he applied as an accessory use if he gave rides only to customers of the restaurant and not to the public at large. See Defendants' Exhibit I.

22. Admitted.

23. Admitted.

24. Admitted.

25. Admitted.

26. Admitted.

27. Admitted.

28. Admitted.

29. Admitted.

30. Admitted.

31. Admitted.

32. Admitted.

33. Admitted.

34. Admitted.

35. Admitted.

36. Admitted in as much as Mary Villa stated that St. Patrick's Church was located approximately 1200-1300 feet from the dock.  See Defendants' Exhibit S.

37. Admitted.

38. Admitted.

39. Admitted.

40. Admitted.

41. Admitted.

42. Admitted.

43. Admitted.

44. Denied.

45. Admitted.

46. Admitted.

47. Admitted.

48. Admitted.

49. Admitted.

50. Admitted.

51. Admitted.

52. Admitted.

53. Admitted.

54. Admitted.

55. Admitted in as much as Villa stated that the Commission was concerned that the application to the ZBA was a way around the decision of the Commission. See Defendants' Exhibit II.

56. Admitted.

57. Admitted.

58. Admitted.

59. The Plaintiffs admit Paragraph 59 in that it reads, "The ZBA received the memo." The Plaintiffs deny the rest of the statements in Paragraph 59. The Plaintiffs submit that Sullivan testified that the memo was not relevant his decision. See Defendants' Exhibit MM. The evidence cited by the Defendants does not support the contention that the memo had no bearing on the ZBA's decision.

60. Admitted.

61. Denied. Exhibit GG does not support the contention that the ZBA asked Mr. Larkin how may parking spaces the Plaintiff needed for his business.

62. Denied. Exhibit GG does not support the Defendants' contention that Mr. Larkin advised that it was unclear, but if one used the standard for marinas, at least one would be required.

63. Admitted.

64. Admitted.

65. Admitted in as much as the ZBA cites as its reason for denial that there was no parking provided and that commercial ventures require at least one designated spot. See Defendants' Exhibit NN.

66. Admitted.

67. Admitted in as much as the Valentis opposed Southern Exposure's application because of parking concerns; concerns about the proposed off-street loading berth; concerns about the proposed variance for the front line to be set back from 50 to 28 feet; and concerns about the decrease of property values. See Defendants' Exhibit RR.

68. Admitted.

69. Admitted.

70. Admitted.

71.   Admitted in so far as Granato and Villa states that the Commission has never approved a special use permit where parking is located over 1000 feet away from the site.  See Defendants' Exhibit V; Exhibit CC.

72.   Admitted.

73.   Denied.  Affidavit of Shillo, pg. 110-11.

74.   Admitted.

75.   Denied.

76.   Admitted.

77.   Denied.

78.   Admitted.

79.   Denied.

80.   Admitted.

81.   Denied.

## II.   Disputed Issues of Material Fact

1.   Mr. Granato acted with a bad-faith or malicious intent to injure the plaintiff in denying the application.

2.   Mr. Lyon acted with a bad-faith or malicious intent to injure the plaintiff in denying the application.

      3.      Mr. Sullivan acted with a bad- or malicious intent to injure the plaintiff in denying the application.

      4.      Mr. Tamsky acted with a bad- or malicious intent to injure the plaintiff in denying the application.

      5.      Mr. Larkin acted with a bad- or malicious intent to injure the plaintiff in denying the application.

      6.      Mr. Donnelly acted with a bad- or malicious intent to injure the plaintiff in denying the application.

      7.      Mr. Thayer acted with a bad- or malicious intent to injure the plaintiff in denying the application.

      8.      Ms. Villa acted with a bad- or malicious intent to injure the plaintiff in denying the application.

**III.**      **<u>Plaintiffs' Statement of Facts</u>**

      1.      In 2000, at age 51, Shillo began operating a business called Merry Charters, LLC, which was focused on providing tours on the Mystic River in Stonington, Connecticut.  See Plaintiffs' Exhibit 1, Affidavit of Shillo.

2. In preparation to run the business, Shillo purchased a boat, named the "Mystic Belle," which was certified by the United States Coast Guard. See Plaintiffs' Exhibit 1, Affidavit of Shillo.

3. The boat was equipped for a maximum capacity of 57 people. See Plaintiffs' Exhibit 2, Public Hearing Transcript, pg. 20.

4. Shillo began the business with the intention to operate it until he retired and to run it as a family business. See Plaintiffs' Exhibit 3, Deposition of Shillo, pg. 59-60.

5. Shillo intended to pass the business on to his son once he retired. See Plaintiffs' Exhibit 3, Deposition of Shillo, pg. 59-60.

6. The dock where the Mystic Belle was tied up had historically been used for commercial boats and businesses. See Plaintiffs' Exhibit 4, Deposition of Larkin, pgs. 232-233; Plaintiffs' Exhibit 5, Public Hearing Transcript, pg. 22-23, 27-28.

7. Part of Merry Charters' business was derived from customers at both Mohegan Sun Casino and Mystic Seaport. See Plaintiffs' Exhibit 3, Deposition of Shillo, pgs. 44-48.

8. Customers at Mohegan Sun Casino and Mystic Seaport would purchase discount tickets for a ride on the Mystic Belle. See id.

9. The customers were oftentimes transported by bus from the casino and seaport to the Mystic Belle. Id.

10. At all times relevant hereto, Joseph Larkin was the Zoning Enforcement Officer for the Town of Stonington. See Plaintiffs' Exhibit 3, Deposition of Larkin, pg. 9.

11. In June 2000, Attorney Mark Kepple had a meeting with Larkin whereby Attorney Mark Kepple complained to Larkin that Merry Charters was operating without a permit or an approved site plan. See Plaintiffs' Exhibit 6, Meeting Report Form; Plaintiffs' Exhibit 4, Deposition of Larkin, pgs. 87-88.

12. Subsequently, Larkin went to the dock where the Mystic Belle was located and spoke with Shillo. See Plaintiffs' Exhibit 4, Deposition of Larkin, pg. 43.

13. On June 27, 2000, Shillo had a meeting with Larkin and Donnelly. See Plaintiffs' Exhibit 3, Deposition of Shillo, pg. 36; See Plaintiffs' Exhibit 6, Meeting Report Form, dated June 27, 2000.

14. At that meeting, Larkin and Donnelly led Shillo to believe that the alleged violations were "no big deal." See Plaintiffs' Exhibit 3, Deposition of Shillo, pg. 19.

15. They also told Shillo to "[j]ust come in, go through the process. We like the operation. We think it's a good thing for Mystic . . . . You'll get your permit." Id.

16. After the first application was denied, Shillo told Donnelly that he had secured parking spaces at St. Patrick's Church. See Plaintiffs' Exhibit 1, Affidavit of Shillo.

17. Donnelly told Shillo that Shillo had to submit engineer drawings of the parking spaces before he could get his permit. Id.

18. Shillo retained an engineer who produced drawings of the parking spaces. Id.

19. Shillo met with Donnelly and submitted the engineer drawings to Donnelly. After looking at the drawings, Donnelly told Shillo that Shillo was all set to submit a second application. Id.

20. The Commission requested that Villa prepare a memorandum to the ZBA indicating that the Commission was against the granting of a variance. See Plaintiffs' Exhibit 7, Deposition of Villa, pg. 55-56.

21. Villa testified that the purpose of the memorandum was to ensure that the Commission did not lose their power in applying the regulations. See Plaintiffs' Exhibit 7, Deposition of Villa, pg. 57.

22. The Commission also wanted to remind the ZBA how to do its business. See Plaintiffs' Exhibit 7, Deposition of Villa, pg. 61.

23. The memorandum was signed by Thayer. See Defendants' Exhibit LL.

24. To date, this is the only memorandum that Thayer prepared and sent to the ZBA. See Plaintiffs' Exhibit 8, Deposition of Thayer, pg. 41.

25. It is also the only memorandum or letter that Sullivan ever received from Thayer. See Plaintiffs' Exhibit 9, Deposition of Sullivan, pg. 42.

26. Shillo was ultimately forced to sell the Mystic Belle. See Plaintiffs' Exhibit 3, Deposition of Shillo, pgs. 122-23.

27. Before selling the boat, however, Shillo attempted to find several alternative docks from which to run the business. See Plaintiffs' Exhibit 3, Deposition of Shillo, pg. 61-66.

28. Throughout the process surrounding the Plaintiffs' zoning applications, Shillo was being given the "hometown treatment" by the members of the Commission and the ZBA. See Plaintiffs' Exhibit 3, Deposition of Shillo, pg. 76-77.

29. He was also refused parking because he was an outsider. Id.

30. Shillo was refused parking because he was not a property owner. See Plaintiffs' Exhibit 8, Deposition of Thayer, pgs. 54-55.

31. The Town of Stonington has a history of distributing parking spaces on the basis of who was requesting the parking spaces. Id.

32.     Moreover, the Town of Stonington is run by a "good-old-boys network." See Plaintiffs' Exhibit 7, Deposition of Villa, pg. 88-89.

33.     Employees of the Town and members of the Commission and ZBA will "look the other way" on certain zoning violations. See Plaintiffs' Exhibit 4, Deposition of Larkin, pg. 63.

34.     The restaurant, Anthony J's, is located at 6 Holmes Street on the same street as the Mystic Belle's dock. See Plaintiffs' Exhibit 1, Affidavit of Shillo.

35.     Anthony J's has twenty-one (21) parking spaces on Holmes Street and "no off-street parking." See Plaintiffs' Exhibit 10, Commission's Notes regarding application of Trader Jack's, PZ0113SUP.

36.     To date, the Commission has not issued a Notice of Violation for Anthony J's or forced the restaurant to secure on-site parking as it has forced the Plaintiffs' to secure such parking. See Plaintiffs' Exhibit 1, Affidavit of Shillo.

37.     On May 30, 1990, the Zoning Board of Appeals determined that the appropriate number of parking spaces for the Mystic River Queen was between three (3) and four (4) spaces. See Plaintiffs' Exhibit 11, Zoning Board of Appeals, Decision dated May 30, 1990.

38. The Argia is a tour boat that is currently operated on the Mystic River in Stonington, Connecticut, and is located at a dock approximately 100 yards from the dock where the Plaintiff's boat was previously located. See Plaintiffs' Exhibit 4, Deposition of Larkin, pg. 199.

39. The Argia not only operates at almost the same location as Merry Charters, but it also sells tickets for rides on the tour boat at the same places that Merry Charters sold tickets for tours on its boat, the Mystic Belle. See Plaintiffs' Exhibit 1, Affidavit of Shillo.

40. Unlike Merry Charters and the Mystic River Queen, there is no indication that the Argia was required to apply for a special use permit. See Plaintiffs' Exhibit 4, Deposition of Larkin, pg. 197.

41. Joseph Larkin, the Zoning Enforcement Officer, testified that the Argia was not required to obtain such a permit because the Argia was docked at a dock that had been historically used for commercial businesses. See Plaintiffs' Exhibit 4, Deposition of Larkin, pg. 197-98.

42. The denial without prejudice on October 17, 2000, encouraged Shillo to submit another application. See Plaintiffs' Exhibit 8, Deposition of Thayer, pgs. 34-35.

43. There is nothing in the zoning regulations that suggests that Merry Charters was violating any regulation by obtaining parking at St. Patrick's Church. See Plaintiffs' Exhibit 7, Deposition of Villa, pg. 63.

44. The Chairman himself testified that he did not have a problem with the off-site parking at the church. See Plaintiffs' Exhibit 8, Deposition of Thayer, pg. 32-33.

45. On September 14, 2000, the Board of Police Commissioners indicated that they had no comment on regarding the Plaintiffs' first application for special use permit. See Plaintiffs' Exhibit 12, Comment Sheet.

46. With regard to the safety and traffic congestion concerns, Villa testified that she did not do anything to determine how much more traffic would be generated by Merry Charters. See Plaintiffs' Exhibit 7, Deposition of Villa, pg. 46.

47. Villa reviewed a police report that indicated that parking violations in Mystic had increased. See Plaintiffs' Exhibit 7, Deposition of Villa, pg. 47.

48. The ZBA and the Commission are two separate bodies, independent of each other. See Plaintiffs' Exhibit 7, Deposition of Villa, pg. 57.

49. Because of this independence, the Commission is not in the habit of informing the ZBA of its position. See Plaintiffs' Exhibit 9, Deposition of Sullivan, pg. 47.

50. There is no interaction between the Chairman of the Commission and the ZBA. See Plaintiffs' Exhibit 8, Deposition of Thayer, pg. 45.

51. The ZBA did not receive letters from the Commission on a regular basis. See Plaintiffs' Exhibit 9, Deposition of Sullivan, pg. 36.

52. According to Thayer, the purpose of the letter was to get the Commission's and the ZBA's "stories straight" on the Plaintiffs' various zoning applications. See Plaintiffs' Exhibit 8, Deposition of Thayer, pg. 41.

53. Villa also testified that the letter was constructed because the Commission wanted the Plaintiffs' application denied by the ZBA. See Plaintiffs' Exhibit 7, Deposition of Villa, pg. 80.

54. The Commission had the policy of following the Town Attorney's opinion. See Plaintiffs' Exhibit 8, Deposition of Thayer, pgs. 25-26.

55. This was the first time that the Commission has ever declined to follow the opinion of the Town Attorney. See Plaintiffs' Exhibit 4, Deposition of Larkin, pg. 115.

56. There is no evidence that anyone independently determined that having parking at St. Patrick's Church would increase the traffic. See Plaintiffs' Exhibit 7, Deposition of Villa, pg. 46.

57. The Commission has a history of allowing special parking arrangements under 7.10.2. See Plaintiffs' Exhibit 8, Deposition of Thayer, pg. 61; Defendants' Exhibit W.

58. The Mystic Belle and the Mystic River Queen both made one (1) hour trips down the river, about five (5) times a day. See Plaintiffs' Exhibit 1, Affidavit of Shillo; Plaintiffs' Exhibit 11, ZBA's minutes on Application 90-022, pg. 101.

59. The Mystic Belle and the Mystic River Queen were both equipped with their own sanitary systems. See Plaintiffs' Exhibit 1, Affidavit of Shillo; Plaintiffs' Exhibit 11, pg. 101.

60. The Mystic River Queen had a capacity of sixty (60) passengers. See Plaintiffs' Exhibit 11, pg. 101.

        THE PLAINTIFFS,
        MERRY CHARTERS, LLC and
        CARL SHILLO


By:_____
   JOSEPHINE A. SPINELLA
   Silvester & Daly
   72 Russ Street
   Hartford, CT 06103
   Tel. (860) 278-2650
   Federal Bar No. CT24009

## **CERTIFICATION**

      I, Josephine A. Spinella, attorney for the Plaintiff, hereby certify that a copy of the foregoing has been mailed, postage prepaid, in the United States Mail, this 5th day of May, 2004 to:

Melinda Powell, Esq.
Howd & Ludorf
65 Wethersfield Avenue
Hartford, CT 06114

                                                                            By:_____
                                                                              JOSEPHINE A. SPINELLA
                                                                              Silvester & Daly

shillo-merry/answer to local rule stmt.041904