UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MERRY CHARTERS, LLC and<br>CARL SHILLO | : <br> : <br> : | NO.: 3:02CV336 (MRK) |
| v. | : <br> : | |
| TOWN OF STONINGTON, STONINGTON<br>PLANNING & ZONING COMMISSION,<br>ZONING BOARD OF APPEALS OF THE<br>TOWN OF STONINGTON, EDWARD T.<br>SULLIVAN and GEORGE THAYER | : <br> : <br> : <br> : <br> : | <br><br><br><br>MAY 26, 2004 |

## REPLY TO PLAINTIFFS' LOCAL RULE 56(a)2 STATEMENT

1. In 2000, at age 51, Shillo began operating a business called Mary Charters, LLC, which was focused on providing tours on the Mystic River in Stonington, Connecticut. See Plaintiffs' Exhibit 1, Affidavit of Shillo.

**REPLY:** Denied to the extent that plaintiff claims the original plan was to operate in downtown Stonington. See attached 10/5/00 Transcript, p. 4-7. **Exhibit BBB**.

2. In preparation to run the business, Shillo purchased a boat, named the "Mystic Belle," which was certified by the United States Coast Guard. See Plaintiffs' Exhibit 1, Affidavit of Shillo.

**REPLY:** Admitted.

3. The boat was equipped for a maximum capacity of 57 people. See Plaintiffs' Exhibit 2, Public Hearing Transcript, Pg. 20.

**REPLY:** Admitted.

      4.      Shillo began the business with the intention to operate it until he retired and to run it as a family business.  See Plaintiffs' Exhibit 3, Deposition of Shillo, pg. 59-60.

**REPLY:**  Admitted plaintiff testified to this intention.

      5.      Shillo intended to pass the business on to his son once he retired.  See Plaintiffs' Exhibit 3, Deposition of Shillo, pg. 59-60.

**REPLY:**  Admitted plaintiff testified to this intention.

      6.      The dock where the Mystic Belle was tied up had historically been used for commercial boats and businesses.  See Plaintiffs' Exhibit 4, Deposition of Larkin, pgs. 232-233; Plaintiffs' Exhibit 5, Public Hearing Transcript, pg. 22-23, 27-28.

**REPLY:**  Denied.  Larkin testified he was not aware of any commercial boats tied up to the S&P Oyster House dock.  Plaintiffs' Exhibit 4, p. 232, ln. 14-17.  He testified that there were pictures submitted either at the ZBA or Commission hearings that "those docks along that stretch of the river had been used historically in the past."  Id., p. 233, ln. 1-2.

      7.      Part of Merry Charters' business was derived from customers at both Mohegan Sun Casino and Mystic Seaport.  See Plaintiffs' Exhibit 3, Deposition of Shillo, pgs. 44-45.

**REPLY:**  Admitted that plaintiff claims these sources of business.

8.	Customers at Mohegan Sun Casino and Mystic Seaport would purchase discount tickets for a ride on the Mystic Belle.  See Id.

**REPLY:**  Admitted that plaintiff claims these sources of business.

9.	The customers were oftentimes transported by bus from the casino and seaport to the Mystic Belle.  Id.

**REPLY:**  Admitted that plaintiff claims this was the manner in which they were transported.

10.	At all times relevant hereto, Joseph Larkin was the Zoning Enforcement Officer for the Town of Stonington.  See Plaintiffs' Exhibit 3, Deposition of Larkin, pg. 9.

**REPLY:**  Admitted.

11.	In June 2000, Attorney Mark Kapple had a meeting with Larkin whereby Attorney Mark Kepple complained to Larkin that Merry Charters was operating without a permit or an approved site plan.  See Plaintiffs' Exhibit 6, Meeting Report Form; Plaintiffs' Exhibit 4, Deposition of Larkin, pgs. 87-88.

**REPLY:**  Admitted.

12.	Subsequently, Larkin went to the dock where the Mystic Belle was located and spoke with Shillo.  See Plaintiffs' Exhibit 4, Deposition of Larkin, pg. 43.

**REPLY:**  Admitted.

     13.    On June 27, 2000, Shillo had a meeting with Larkin and Donnelly.  See Plaintiffs' Exhibit 3, Deposition of Shillo, pg. 36; See Plaintiffs' Exhibit 6, Meeting Report Form, dated June 27, 2000.

**REPLY:**  Admitted.

     14.    At that meeting, Larkin and Donnelly led Shillo to believe that the alleged violations were "no big deal."  See Plaintiffs' Exhibit 3, Deposition of Shillo, pg. 19.

**REPLY:**  Can not admit or deny as it is a characterization rather than a statement of fact.

     15.    They also told Shillo to "[j]ust come in, go through the process.  We like the operation.  We think it's a good thing for Mystic . . . .You'll get your permit." Id.

**REPLY:**  Denied.  Defendants deny Donnelly and Larkin assured the plaintiff a permit. Decisions on permits are made by the Commission.

     16.    After the first application was denied, Shillo told Donnelly that he had secured parking spaces at St. Patrick's Church.  See Plaintiffs' Exhibit 1, Affidavit of Shillo.

**REPLY:**  Admitted.

     17.    Donnelly told Shillo that Shillo had to submit engineer drawings of the parking spaces before he could get his permit.  Id.

**REPLY:**  Admitted that a site plan is usually required for a special permit application.

     18.    Shillo retained an engineer who produced drawings of the parking spaces. Id.

**REPLY:**  Admitted that Shillo submitted a site plan.

19.     Shillo met with Donnelly and submitted the engineer drawings to Donnelly.  After looking at the drawings, Donnelly told Shillo that Shillo was all set to submit a second application.  Id.

**REPLY**:  Admitted.

20.     The Commission requested that Villa prepare a memorandum to the ZBA indicating that the Commission was against the granting of a variance.  See Plaintiff's Exhibit 7, Deposition of Villa, pg. 57.

**REPLY**:  Admitted.

21.     Villa testified that the purpose of the memorandum was to ensure that the Commission did not lose their power in applying the regulations.  See Plaintiffs' Exhibit 7, Deposition of Villa, pg. 55-56.

**REPLY**:  Admitted.

22.     The Commission also wanted to remind the ZBA how to do is business.  See Plaintiffs' Exhibit 7, Deposition of Villa, pg. 61.

**REPLY**:  Admitted that Ms. Villa agreed with plaintiff's counsel's characterization to this effect.

23.     The memorandum was signed by Thayer.  See Defendants' Exhibit LL.

**REPLY**:  Admitted.

24.     To date, this is the only memorandum that Thayer prepared and sent to the ZBA.  See Plaintiffs' Exhibit 8, Deposition of Thayer, pg. 41.

**REPLY**:  Admitted.

25.    It is also the only memorandum or letter that Sullivan ever received from Thayer.  See Plaintiffs' Exhibit 9, Deposition of Sullivan, pg. 42.

**REPLY:**  Admitted.

26.    Shillo was ultimately forced to sell the Mystic Belle.  See Plaintiffs' Exhibit 3, Deposition of Shillo, pgs. 122-23.

**REPLY:**  Admitted that plaintiff sold the Mystic Belle.

27. Before selling the boat, however, Shillo attempted to find several alternative docks from which to run the business.  See Plaintiffs' Exhibit 3, Deposition of Shillo, pg. 61-66.

**REPLY:**  Admitted that plaintiff testified to this fact.

28.    Throughout the process surrounding the Plaintiffs' zoning applications, Shillo was being given the "hometown treatment" by the members of the Commission and the ZBA.  See Plaintiffs' Exhibit 3, Deposition of Shillo, pg. 76-77.

**REPLY:**  Admitted that plaintiff claims he was given the "hometown treatment."

29.    He was also refused parking because he was an outsider.  Id.

**REPLY:**  Denied.

30.    Shillo was refused parking because he was not a property owner.  See Plaintiffs' Exhibit 8, Deposition of Thayer, pgs. 54-55.

**REPLY:**  Denied.  Thayer testified he recalled something in the Zoning regulations about parking having to be under the same ownership.  See also attached **Exhibit CCC**, Zoning Regulations § 7.10.1,2 which states, "Required parking spaces shall be on the lot proposed for development and be under single ownership and control."

31.     The Town of Stonington has a history of distributing parking spaces on the basis of who was requesting the parking spaces. Id.

**REPLY:** Denied.

32.     Moreover, the Town of Stonington is run by a "good-old-boys network." See Plaintiffs' Exhibit 7, Deposition of Villa, pg. 88-89.

**REPLY:** Denied. Villa testified she had a "feeling" there was a good-old-boys network in Stonington. See Plaintiffs' Exhibit 7, p. 88-89. She did not testify that Stonington "is run" by a good-old-boys network.

33.     Employees of the Town and members of the Commission and ZBA will "look the other way" on certain zoning violations. See Plaintiffs' Exhibit 4, Deposition of Larkin, pg. 63.

**REPLY:** Denied. Larkin testified basically that on some issues he looks the other way. He never said other employees, the Commission or the ZBA look the other way. The Commission and ZBA do not do enforcement.

34.     The restaurant, Anthony J's, is located at 6 Holmes Street on the same street as the Mystic Belle's dock. See Plaintiffs' Exhibit 1, Affidavit of Shillo.

**REPLY:** Admitted Anthony J's is on Holmes Street across the street from S&P Oyster Company and the dock.

      35.    Anthony J's has twenty-one (21) parking spaces on Holmes Street and "no off-street parking."  See Plaintiffs' Exhibit 10, Commission's Notes regarding application of Trader Jack's, PZ0113SUP.

**REPLY:**  Denied that Exhibit 10 is "Commission's Notes."  Denied that Anthony J's got a permit from the Commission for twenty-one spaces on Holmes Street.  See attached Affidavit of Joe Larkin, **Exhibit DDD**.  Larkin has attested to the history of Anthony J's.  He attested that Anthony J's was permitted to operate as a prior conforming use, as a result of a 1977 Commission approval for a restaurant at the same location, the "Mischievous Carrot."  Id., see also, **Exhibit HHH**.  The "Mischievous Carrot" was granted a permit under different zoning regulations with different parking requirements.  It had seven on-site spaces, whereas it only needed two.  The on-site parking complied with the regulations, so the applicants' additional parking arrangements at Valenti Chevrolet and St. Patrick's Church were unnecessary.  Id.  See Affidavit for Mr. Larkin's conditions concerning the history of Anthony J's.  See also **Exhibit III**, Mischievous Carrot application.

      36.    To date, the Commission has not issued a Notice of Violation for Anthony J's or forced the restaurant to secure on-site parking as it has forced the Plaintiffs to secure such parking.  See Plaintiff's Exhibit 1, Affidavit of Shillo.

**REPLY:**  Denied.  The Commission does not issue notices of violation.

37. On May 30, 1990, the Zoning Board of Appeals determined that the appropriate number of parking spaces for the Mystic River Queen was between three (3) and four (4) spaces. See Plaintiffs' Exhibit 11, Zoning Board of Appeals' Decision dated May 30, 1990.

**REPLY:** Denied. Plaintiffs' Exhibit 11 is not the ZBA's decision, it is minutes. The last page of the minutes indicate four spaces were required.

38. The Argia is a tour boat that is currently operated on the Mystic River in Stonington, Connecticut, and is located at a dock approximately 100 yards from the dock where the Plaintiff's boat was previously located. See Plaintiffs' Exhibit 4, Deposition of Larkin, pg. 199.

**REPLY:** Admitted.

39. The Argia not only operates at almost the same location as Merry Charters, but is also sells tickets for rides on the tour boat at the same places that Merry Charters sold tickets for tours on its boat, the Mystic Belle. See Plaintiffs' Exhibit 1, Affidavit of Shillo.

**REPLY:** Unable to admit or deny whether the current owners of the Argia sell tickets at the same location the plaintiff did.

40. Unlike Merry Charters and the Mystic River Queen, there is no indication that the Argia was required to apply for a special use permit. See Plaintiffs' Exhibit 4, Deposition of Larkin, pg. 197.

**REPLY:** Denied. The Mystic River Queen applied to the ZBA for a determination of parking requirements, not a special permit. There is no evidence that it operated after

the parking requirements were determined. The Argia was determined to be prior nonconforming uses that did not need permits. See **Exhibit EEE**, Certificate of Zoning Compliance dated June 5, 2001 and **Exhibit FFF**, Letter to PJ Matthews from Joe Larkin dated June 28, 1993, discussing pre-existing nonconforming use of that dock.

  41. Joseph Larkin, the Zoning Enforcement Officer, testified that the Argia was not required to obtain such a permit because the Argia was docked at a dock that had been historically used for commercial businesses. See Plaintiffs' Exhibit 4, Deposition of Larkin, pg. 197-98.

**REPLY:** Admitted that in 1993 Mr. Larkin determined activities at that dock were pre-existing nonconforming uses, based upon the prior commercial use. **Exhibit FFF**; **Exhibit GGG**, p. 231.

  42. The denial without prejudice on October 17, 2000, encouraged Shillo to submit another application. See Plaintiffs' Exhibit 8, Deposition of Thayer, pgs. 34-35.

**REPLY:** Denied that the denial "encouraged" Mr. Shillo to reapply.

  43. There is nothing in the zoning regulations that suggest that Merry Charters was violating any regulation by obtaining parking at St. Patrick's Church. See Plaintiffs' Exhibit 7, Deposition of Villa, pg. 63.

**REPLY:** Denied. Villa testified the <u>arrangement</u> between Merry Charters and the church did not violate zoning regulations. Plaintiffs' counsel, in the question prior, suggested she had told the press the arrangement violated the zoning regulations, which she denied.

44. The Chairman himself testified that he did not have a problem with the off-site parking at the church. See Plaintiffs' Exhibit 8, Deposition of Thayer, pg. 32-33.

**REPLY:** Denied. Thayer testified on page 33 that he had no problem with the arrangement with St. Patrick's Church but there still was not enough parking where the boat was. So, he did have a problem with <u>only</u> off-site parking.

45. On September 14, 2000, the Board of Police Commissioners indicated that they had no comment on regarding the Plaintiffs' first application for special use permit. See Plaintiffs' Exhibit 12, Comment Sheet.

**REPLY:** Admitted.

46. With regard to safety and traffic congestion concerns, Villa testified that she did not do anything to determine how much more traffic would be generated by Merry Charters. See Plaintiffs' Exhibit 7, Deposition of Villa, pg. 46.

**REPLY:** Admitted.

47. Villa reviewed a police report that indicated that parking violations in Mystic had increased. See Plaintiffs' Exhibit 7, Deposition of Villa, pg. 47.

**REPLY:** Admitted.

      48.      The ZBA and the Commission are two separate bodies, independent of each other.  See Plaintiffs' Exhibit 7, Deposition of Villa, pg. 57.

**REPLY:**  Admitted.

      49.      Because of this independence, the Commission is not in the habit of informing the ZBA of its position.  See Plaintiffs' Exhibit 9, Deposition of Sullivan, pg. 47.

**REPLY:**  Admitted that Sullivan testified the Commission is not in the habit of telling the ZBA whether it is in favor of a variance request.

      50.      There is no interaction between the Chairman of the Commission and the ZBA.  See Plaintiffs' Exhibit 8, Deposition of Thayer, pg. 45.

**REPLY:**  Denied.  There was interaction in this case.

      51.      The ZBA did not receive letters from the Commission on a regular basis. See Plaintiffs' Exhibit 9, Deposition of Sullivan, pg. 36.

**REPLY:**  Admitted.

      52.      According to Thayer, the purpose of the letter was to get the Commission's and the ZBA's "stories straight" on the Plaintiffs' various zoning applications.  See Plaintiffs' Exhibit 8, Deposition of Thayer, pg. 41.

**REPLY:**  Denied.  Mr. Thayer testified the motivation was because there had been miscommunication between the commissions.  On page 37 of Thayer's transcript, stated the discussion about the memo and why it was written, which continues through page 39.  The testimony shows there was a concern whether each commission was getting the same information from the applicant.  The use of the phrase "stories

straight" is unclear, but when read in light of all the testimony, seems to mean that he wanted both commissions to be clear on the applicant's proposal. The whole testimony shows the memo was written out of a concern that one Commission did not know what the other was doing. See attached **Exhibit JJJ**, Thayer Transcript, p. 37-39.

53. Villa also testified that the letter was constructed because the Commission wanted the plaintiffs' application denied by the ZBA. See Plaintiffs' Exhibit 7, Deposition of Villa, pg. 80.

**REPLY:** Admitted.

54. The Commission had the policy of following the Town Attorney's opinion. See Plaintiffs' Exhibit 8, Deposition of Thayer, pgs. 25-26.

**REPLY:** Admitted that the Commission generally relied on the Town Attorney's legal opinions. The Town Attorney does not make decisions on whether an application should be granted or denied.

55. This was the first time that the Commission has ever declined to follow the opinion of the Town Attorney. See Plaintiffs' Exhibit 4, Deposition of Larkin, pg. 115.

**REPLY:** Denied. The Town Attorney never recommended the plaintiffs' application should be granted. Mr. Larkin did not testify to what plaintiff claims.

56. There is no evidence that anyone independently determined that having parking at St. Patrick's Church would increase the traffic. See Plaintiffs' Exhibit 7, Deposition of Villa, pg. 46.

**REPLY:** Denied. The memo from the Board of Police Commissioners was concerned with traffic and parking. See Defendants' Exhibit AA to Memorandum of Law.

57. The Commission has a history of allowing special parking arrangements under 7.10.2. See Plaintiffs' Exhibit 8, Deposition of Thayer, pg. 61; Defendants' Exhibit W.

**REPLY:** Denied that there was a history. Admitted that 7.10.2 has been used to permit adjacent, on-street parking. Thayer testified he could not remember whether another applicant, in a not similar case, reduced their square footage or did away with part of their proposal to meet the parking requirements.

58. The Mystic Belle and the Mystic River Queen both made one (1) hour trips down the river, about five (5) times a day. See Plaintiffs' Exhibit 1, Affidavit of Shillo; Plaintiffs' Exhibit 11, ZBA's minutes on Application 90-022, pg. 101.

**REPLY:** Admitted that the Mystic River Queen represented they gave five trips a day. However, there is also evidence in Plaintiffs' exhibit that the Mystic River Queen took seven trip per day. Denied as to the plaintiff. Plaintiff represented to the Commission he took seven to eight trips per day of half hour in length. See **Exhibit BBB**, 10/5/00, Transcript, p. 12, ln. 2-17.

59. The Mystic Belle and the Mystic River Queen were both equipped with their own sanitary systems. See Plaintiffs' Exhibit 1, Affidavit of Shillo; Plaintiffs' Exhibit 11, pg. 101.

**REPLY:** Denied. Plaintiff's Exhibit 11 includes a reference to the Mystic River Queen dumping sewage into the river.

60. The Mystic River Queen had a capacity of sixty (60) passengers. See Plaintiffs' Exhibit 11, pg. 101.

**REPLY:** Admitted the Mystic River Queen may have represented it had sixty passengers.

          DEFENDANTS,
          TOWN OF STONINGTON,
          STONINGTON PLANNING & ZONING
          COMMISSION, TOWN OF STONINGTON
          ZONING BOARD OF APPEALS,
          EDWARD SULLIVAN and
          GEORGE THAYER


By_____
  Melinda A. Powell
  ct17049
  Howd & Ludorf
  65 Wethersfield Avenue
  Hartford, CT  06114
  860 249-1361
  (860) 249-7665 (Fax)
  mpowell@hl-law.com

## **CERTIFICATION**

       This is to certify that a copy of the foregoing has been sent, handling charges prepaid, via U.S. Mail, to the following counsel of record this 26th day of May, 2004.

Frank J. Szilagyi, Esquire
Josephine A. Spinella, Esquire
Silvester & Daly
72 Russ Street
Hartford, CT  06106

                                                                   _____
                                                                   Melinda A. Powell